UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IRYNA DYMSKAYA,<br>    Plaintiff,<br><br>            v.<br><br>OREM'S DINER OF WILTON, INC.,<br>    Defendant. | No. 3:12-cv-00388 (JAM) |

**RULING ON POST-TRIAL MOTIONS**

Plaintiff Iryna Dymskaya, a female of Belarusian descent, brought this employment discrimination action against her former employer, defendant Orem's Diner of Wilton, Inc. Among other claims, plaintiff alleged a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Plaintiff alleged that she endured a battery of gender-based abuse while working at the diner—abuse inflicted predominantly by a single non-supervisory male co-worker—and that the diner's management knew of this situation but did not take reasonable steps to remediate it.

After a three-day trial, the jury returned a mixed verdict. The jury found in defendant's favor on three out of plaintiff's four claims, but they returned a verdict in favor of plaintiff on her gender-based hostile work environment claim, and they also awarded damages. Defendant has now moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. This ruling addresses that motion and other pending post-trial matters.

For the reasons set forth below, I deny defendant's motion for judgment as a matter of law, and I uphold the jury's award of emotional distress damages and punitive damages. I conclude, however, that the jury's verdict as to back pay damages should be treated as advisory.

1

And because I conclude that back pay damages are not available as a matter of law under the circumstances, I decline to award back pay.

## BACKGROUND

In view of the standard governing defendant's motion for judgment as a matter of law, the following facts—taken from the trial record—are stated in the light most favorable to plaintiff, the nonmoving party.[1] In early 2006, plaintiff began working as a waitress at Orem's Diner, a family-owned establishment in Wilton, Connecticut. One of plaintiff's co-workers at the diner was a cook named Roberto Garcia. Garcia was a non-supervisory employee, but he apparently thought quite highly of his own status at the diner and referred to himself as "the boss of the kitchen." Early on, plaintiff and Garcia were on friendly terms. Plaintiff even drove Garcia home after work on several occasions. But their cordial relationship soured at some point, and during the final two years of her employment at the diner—in 2009 and 2010—plaintiff routinely experienced lewd and derogatory comments directed at her by Garcia. Because defendant contests whether the evidence was sufficient to support a finding of a hostile work environment, I must regrettably detail the unpleasant evidence of Garcia's graphic comments and conduct.

Plaintiff and Garcia interacted mostly in the kitchen, where plaintiff would go to get food orders from Garcia to bring out to customers. When plaintiff went to the kitchen to pick up trays of food, Garcia would often call her names, such as "Russian whore," "bitch," "stinky bitch,"

---

[1] I note that plaintiff largely relied on her own testimony—as well as documentary evidence that she herself created—in order to prove her case at trial. As defendant correctly points out, much of plaintiff's testimony was uncorroborated by any other witnesses—indeed, most witnesses offered accounts of the environment at Orem's Diner that sharply conflicted with the portrait painted by plaintiff. Nevertheless, the jury was entitled to credit plaintiff's testimony and discredit the testimony of other witnesses, and I am not permitted to "[re]assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute [my own] judgment for that of the jury." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) (internal quotation marks omitted); *see also Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 110 (1959) (district court may not "'reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because [the district judge] feel[s] other results are more reasonable'") (quoting *Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35 (1944)).

"fucking bitch," and "stinky whore" (among many other coarse insults). Comments such as these happened regularly—sometimes weekly, but usually more often, even several times per day. On some days, other cooks (besides Garcia) would also call plaintiff a "bitch" or a "whore," or make other vile comments about plaintiff's body. Plaintiff testified, however, that the severity and frequency of the comments made by the other cooks paled in comparison to the conduct of Garcia.

At some point during this ordeal, plaintiff began writing notes documenting various incidents with Garcia on her waitress pads. She kept many of those notes, and over a dozen of her note entries were introduced at trial.[2] The following specific incidents (among others) are described in the notes on plaintiff's waitress pads:

- Garcia said to plaintiff, "[f]ucking waitress, shut up fucking whore. You're going to be waitress for the rest of your life."

- Garcia referred to plaintiff as a "dog" who should work the "street as a hooker."

- Garcia commented that plaintiff "smell[ed] like a whore" and was "not taking a shower."

- Garcia said that plaintiff's "husband doesn't fuck her."

- Garcia declared, "Russian bitch stinks and never takes a shower."

- Plaintiff was told by Garcia to "[g]et your food and get the fuck out of here Russian whore. Suck my fucking dick."

Plaintiff complained repeatedly to the diner's managers about these statements. The diner had four managers: Billy Papanikolaou (the owner), Jimmy Papanikolaou (Billy's son), Joanne Giagkos (Billy's daughter), and Chris Papanikolaou (Billy's nephew). Plaintiff complained about

---

[2] Plaintiff testified that she would document derogatory comments made by Garcia and other cooks by

3

the situation with Garcia and the other cooks to all four of these managers on "numerous" occasions, to varying degrees of success. Sometimes, after receiving a complaint from plaintiff, a manager would informally speak to Garcia about the problem, and the situation would improve for a short period of time—typically for two or three days. But the harassment always resumed.

Plaintiff testified that Jimmy, who worked in the kitchen at times, personally saw cooks make derogatory comments—"fat pig," "bitch," etc.—and never said anything to them "like it was normal for [cooks] to talk to [waitresses] like that." Jimmy also provided Garcia with alcohol—vodka, specifically—during working hours. According to plaintiff's testimony, Garcia was "drunk" at work "all the time." When plaintiff did make complaints to Jimmy about specific incidents, Jimmy would sometimes say that he would talk to Garcia. But, on other occasions, Jimmy would say, "Why don't you call [Garcia] names too?"

Plaintiff's efforts to lodge complaints with Billy, the owner of the diner, were unsuccessful. According to plaintiff, Billy "blew me off" whenever she complained about Garcia. Plaintiff said that Billy (who did not testify at trial) "always" defended the cooks and busboys, calling them his "boys" and referring to Garcia in particular as his "son." On one occasion in November 2009, plaintiff complained to Billy about a comment Garcia had just made, and in response Billy made a flippant hand gesture and accused plaintiff of "lying" about the incident. Plaintiff was upset, and she quit her job at Orem's Diner later that day. She quickly returned to work, however, after being assured by Joanne that Billy would apologize to her and that Garcia's abuse would stop.

But the problems with Garcia did not stop. One day shortly after plaintiff returned to work, Garcia exposed his private parts through his kitchen apron while plaintiff was waiting in

---

making quick notes on her waitress pad immediately following each incident. I admitted the majority of these waitress pad notes into evidence over defendant's objection under Fed. R. Evid. 803(1) (present sense impression).

4

the kitchen for an order. Plaintiff testified that Garcia "shook" his anatomy and told plaintiff, "You can go suck my dick." The derogatory comments and behavior continued and eventually, in November of 2010, plaintiff quit her job at Orem's Diner for good after Garcia allegedly threatened to shoot her. Plaintiff made a report to the Wilton police concerning this incident.[3]

In March 2012, plaintiff filed this lawsuit against the diner. After trial in the case, the jury found in favor of plaintiff on her gender-based hostile work environment claim. But the jury found in favor of defendant on plaintiff's three other claims: a claim that plaintiff endured a hostile work environment on the basis of her national origin and claims for constructive discharge and negligent supervision. The jury awarded plaintiff a total of $53,500 in compensatory damages—consisting of $31,000 in back pay and $22,500 in emotional distress damages—as well as punitive damages in the sum of $31,001.

## DISCUSSION

### *Defendant's Motion for Judgment as a Matter of Law*

Defendant moves for judgment as a matter of law, arguing that (1) plaintiff failed to introduce sufficient evidence to prove her hostile work environment claim, and (2) even if the verdict on liability is permitted to stand, the evidence was insufficient to support any punitive damages award. I do not agree with either argument.

Under Rule 50, a motion for judgment as a matter of law will be granted only where "a reasonable jury [did] not have a legally sufficient evidentiary basis to find for the party" that prevailed at trial. Fed. R. Civ. P. 50(a)(1). A party seeking judgment on this basis bears a "heavy burden," and will succeed only where "the evidence is such that, without weighing the credibility

---

[3] Garcia did not testify at trial. Following plaintiff's complaint in 2010 to the Wilton police, Garcia was arrested and charged with a misdemeanor, and he was allegedly later identified as an undocumented immigrant and possibly deported. For ample reasons under Fed. R. Evid. 403, I granted a motion *in limine* by defendant to preclude the introduction of evidence concerning Garcia's arrest and his immigration status.

of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 52 (2d Cir. 2014) (internal quotation marks omitted). I must view the evidence "in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in his favor." *Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir. 2014), *as amended* (Nov. 24, 2014).[4]

In light of this highly deferential standard, I conclude that a reasonable jury could have found that defendant subjected plaintiff to a hostile work environment on the basis of her gender. The Supreme Court has held that Title VII is violated by a "discriminatorily hostile or abusive [work] environment"—that is, a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation and quotation marks omitted). In order to prevail on such a claim, "a plaintiff must make two showings: (1) that 'the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' and (2) that there is a 'specific basis for imputing the conduct creating the hostile work environment to the employer.'" *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Feingold v. New York*, 366 F.3d 138, 149–50 (2d Cir. 2004)).

The first element—that the work environment is sufficiently hostile and abusive—has both an objective component and a subjective component. *Ibid.* "The objective hostility of a work environment depends on the totality of the circumstances," and it is assessed from "the

---

[4] Defendant did not request a new trial pursuant to Fed. R. Civ. P. 59, and accordingly I need not analyze defendant's motion under the more lenient standard set forth in that rule. *See, e.g.*, *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992). Even under that standard, however, I would not grant a new trial for the same reasons otherwise set forth in this ruling.

perspective . . . of a reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004) (internal quotation marks omitted). While "the line between boorish and inappropriate behavior and actionable sexual harassment . . . is admittedly indistinct," *Redd v. New York Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012) (alteration in original) (internal quotation marks omitted), some relevant factors to weigh when determining whether that line has been crossed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (internal quotation marks omitted). The conduct complained of must be rather "extreme," and "simple teasing, . . . offhand comments, and isolated incidents (unless extremely serious)" generally will not suffice. *Id.* at 788 (internal citation and quotation marks omitted). Nevertheless, there is no requirement that "[t]he environment . . . be 'unendurable' or 'intolerable'" or totally "egregious"; all that is required is that discrimination in the work environment be "severe or pervasive." *Feingold*, 366 F.3d at 150 (internal quotation marks omitted).

   Viewing the totality of the evidence in the light most favorable to plaintiff, I conclude that a reasonable jury could find that the gender-based incidents here were sufficient in quantity and quality to create a discriminatorily abusive working environment. For approximately a two-year period, plaintiff was subject to a frequent battery of derogatory and misogynistic comments from Garcia and, to a lesser extent, other cooks, and these comments were sex-specific,

demonstrating an extraordinary hostility to women.[5] While just a few of these comments on isolated occasions certainly would not satisfy the rigorous standard required for hostile work environment claims, the comments in this case were quite frequent and they persisted for a couple of years. On any given day when she went to work, plaintiff could expect sexual remarks and harassment directed at her.

When viewed in conjunction with the appalling incident involving Garcia exposing himself to plaintiff and with Garcia's threat of violence against plaintiff, the circumstances in this case cross the threshold from mere boorishness to an objectively hostile work environment. *See, e.g.*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102–03 (2d Cir. 2010) (reasonable jury could find hostile work environment where, over a seven-month period, plaintiff's supervisor made "approximately six . . . sexual comments and, on multiple occasions, grabbed [plaintiff] and other women around the waist, tickled them, and stared as if he were mentally undressing them"); *Petrosino*, 385 F.3d at 222–23 (reversing grant of summary judgment to the defendant employer where plaintiff was routinely exposed to sexually offensive language, jokes, and graffiti that depicted women in a sexually demeaning fashion); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 584 (S.D.N.Y. 2011) (reasonable jury could find plaintiff subject to hostile work environment where plaintiff's supervisor "repeatedly invited her to his house, made comments about her body, expressed romantic feeling toward her in person and over the phone, .

---

[5] Defendant argues that plaintiff failed to provide sufficiently detailed information about each of the alleged incidents of harassment. *See* Doc. #73 at 3. I am not persuaded. At trial, plaintiff introduced handwritten notes documenting over a dozen specific incidents, and she testified that incidents of a similar character and nature occurred regularly over a two-year period. The law does not require that a plaintiff bringing a hostile work environment claim remember precise details about every single incident when she alleges frequent harassment over a multi-year period. *See, e.g.*, *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 327 (N.D.N.Y. 2013) (where plaintiff "allege[d] that much of the conduct . . . occurred on a near-continuous basis over long time periods," the fact that plaintiff "fail[ed] to specify the exact time, place, and actor for each and every incident [was not] fatal to her claim"); *Hawkins v. Groot Indus., Inc.*, 2003 WL 1720069, at *2 (N.D. Ill. 2003) ("[Plaintiff] testified that he was subjected to racial epithets on a *daily* basis. Where a hostile work environment claim involves ongoing conduct, a plaintiff need not date stamp every incident.") (internal quotation marks omitted).

. . repeatedly expressed a desire to 'hug' her," and "engaged in a sexually explicit gesture" in front of plaintiff).

And a jury could easily conclude that plaintiff actually found the environment at Orem's Diner to be hostile, thereby satisfying the subjective component of the hostile work environment standard. *See Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001) (noting that "the plaintiff must demonstrate that she personally considered the environment hostile" to satisfy the subjective component). Plaintiff testified that the barrage of harassment at work caused her exhaustion, stress, sleep difficulties, eating problems, issues with her schoolwork, stomach pain, and other ailments. Moreover, plaintiff actually quit her job twice due to the upsetting work environment, and she even filed a police report about the situation.

Having concluded that a jury could reasonably find that plaintiff experienced a discriminatorily hostile work environment, I now must determine whether there was an evidentiary basis for imputing the conduct creating that hostile work environment to defendant. There is no dispute that any hostile work environment at Orem's Diner was created entirely by Garcia and his fellow cooks, and that these individuals were non-supervisory employees. Employers are not automatically liable for an abusive environment created by their employees. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher*, 524 U.S. 775. But "[a]n employer that has knowledge of a hostile work environment has a duty to take reasonable steps to remedy it." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998). And where non-supervisory co-workers create a hostile work environment, the employer is liable for the existence of that environment if it "knew or reasonably should have known about [the] harassment . . . 'yet failed to take appropriate remedial action.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) (quoting *Duch*, 588 F.3d at 762). "Whether the [employer's]

9

response was reasonable has to be assessed from the totality of circumstances," and "[f]actors to be considered in this analysis [include] the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Distasio*, 157 F.3d at 65.

In this case, the evidence elicited at trial provided an ample basis for a jury to impute the conduct causing the hostile work environment to the defendant employer. To begin with, defendant had notice of the harassing conduct. Plaintiff testified that she lodged numerous complaints regarding the abusive conduct of Garcia and the other cooks with Billy, Jimmy, Joanne, and Chris, and the parties stipulated that these four individuals are all managers whose knowledge is imputed to defendant. Moreover, plaintiff testified that Jimmy personally witnessed cooks making derogatory comments.

Substantial evidence also showed that defendant failed to take appropriate remedial measures to eliminate the abusive environment. Over a two-year period of steady harassment, the only response by members of defendant's management team to plaintiff's repeated complaints was to informally speak to Garcia—the primary harasser—at times. While these conversations did improve the situation temporarily, I cannot fault the jury for finding this response inadequate in light of a persistent problem that continued for a couple years. Defendant never changed Garcia's work schedule to eliminate or lessen contact between him and plaintiff. Despite knowledge of this unceasing harassment, defendant never formally warned, disciplined, demoted, or suspended Garcia. What's more, Billy—the owner of the diner— consistently "blew off" plaintiff when she tried to complain about Garcia, and he was highly defensive of the cooks (and Garcia in particular). Plaintiff testified that Billy even warned female waitresses about their job security if anything should happen to his beloved male kitchen workers. And while at least

some of defendant's managers knew Garcia was drunk at work while engaging in this conduct, they did nothing to stop Garcia's drinking. To the contrary, Jimmy regularly plied Garcia with vodka. In view of all these circumstances, the jury could have found that defendant's response to the conduct causing the hostile work environment was not "effectively remedial and prompt." *Duch*, 588 F.3d at 767 (internal quotation marks omitted). In short, the evidence sufficed to show a gender-based hostile work environment.

### *Punitive Damages*

Having concluded that the jury's determination as to liability was permissible, I now address defendant's alternative contention that the jury's "award of punitive damages must be set aside based on Plaintiff's complete failure to meet the standard required to support such an award." Doc. #71 at 1.[6] Under Title VII, punitive damages are available only if a plaintiff shows that the employer acted "with malice or with reckless indifference to [his or her] federally protected rights." 42 U.S.C. § 1981a(b)(1). To satisfy this standard, there must be evidence indicating some "positive element of conscious wrongdoing" by a managerial employee. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538 (1999) (internal quotation marks omitted). But there is no requirement that the employer's conduct be "egregious" or "outrageous," as long as there is evidence indicating that the employer did not make a good faith effort to comply with federal anti-discrimination law. *Id.* at 544–46; *see also id.* at 551 (Stevens, J., concurring and dissenting as to other issues) ("[S]o long as a Title VII plaintiff proffers sufficient evidence from which a jury could conclude that an employer acted willfully, judges have no place making their own value judgments regarding whether the conduct was 'egregious' or otherwise presents an inappropriate candidate for punitive damages; the issue must go to the jury.").

---

[6] Defendant's punitive damages argument is limited to its assertion that there was no evidence that would permit the jury to award *any* punitive damages at all. Defendant does not contend that the punitive damages award

11

Of course, direct evidence about an employer's state of mind may be hard to come by. Indeed, in this day and age, it is hard to imagine that any manager would march into court and testify that he or she was aware of federal law concerning discrimination in the workplace and chose to ignore it. Accordingly, "[d]irect evidence that an employer acted with knowledge that the discrimination . . . violated federal law is not required; rather, the requisite state of mind may be inferred from the circumstances." *Manzo v. Sovereign Motor Cars, Ltd.*, 2010 WL 1930237, at *2 (E.D.N.Y. 2010), *aff'd*, 419 F. App'x 102 (2d Cir. 2011); *see also Hill v. Airborne Frgt. Corp.,* 212 F. Supp. 2d 59, 76 (E.D.N.Y. 2002) (stating that "[a]rguably . . . it was reasonable for the jury to infer that [the defendant's] managers knew that their actions were in violation of federal law simply by virtue of the well-established Supreme Court case law on discrimination and retaliation, the long standing statutory schemes proscribing such conduct, the size of [defendant's company], and the common knowledge in today's society that employment discrimination is impermissible") (citing cases).

Numerous courts have upheld jury punitive damages awards where the employer's managers knew (or should have known) of discriminatory conduct occurring in the workplace but failed to take adequate steps to address the situation over extended periods of time. For example, in *Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir. 2001), the Second Circuit found that the evidence was sufficient to support punitive damages of $100,000 where a plaintiff who was the victim of persistent harassment "notified company officials about the harassment . . . over one year before [the defendant company] took any remedial action." Similarly, in *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 564 (S.D.N.Y. 2012), the court concluded that the employer's "failure to impose any disciplinary sanction in connection with [a particularly egregious discriminatory] incident" could lead "a rational jury

---

was disproportionate or excessive, nor does it request a remittitur of damages.

[to] find that the [employer] acted with reckless indifference to [the plaintiff's] protected rights," thereby justifying an award of punitive damages. *See also Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1009–10 (7th Cir. 1998) (affirming jury's award of punitive damages where management knew about co-worker's harassing comments and conduct but ignored the problem).

In view of this legal framework and the evidence elicited at trial, I see no reason to disturb the jury's determination that punitive damages were warranted. Plaintiff repeatedly lodged complaints with management concerning the gender-based harassing comments and conduct of Garcia and some other cooks, and she even quit her job in distress over the ongoing abuse. But no manager ever took any type of formal action regarding the situation over a two-year period. Managerial responses ranged from cavalier to contemptuous. Given these facts, the jury could reasonably conclude that defendant acted with reckless indifference to plaintiff's protected rights.

In sum, the jury had a rational evidentiary basis for finding the defendant responsible for a hostile work environment based on plaintiff's gender, and also for awarding punitive damages. Accordingly, I deny defendant's motion for judgment as a matter of law.

### *Back Pay Damages*

Under appropriate circumstances, a Title VII plaintiff may seek "back pay" to recover wages lost as a result of a defendant's discriminatory conduct.[7] *See, e.g.*, *Bergerson v. New York State Office of Mental Health, Cent. New York Psychiatric Ctr.*, 652 F.3d 277, 286 (2d Cir. 2011) (citing 42 U.S.C. § 1981a(b)(2)). Back pay awards are designed to compensate for "what the employee . . . would have earned had he [or she] not been discharged." *Kirsch v. Fleet St., Ltd.,*

---

[7] A plaintiff is also entitled to an award of front pay when the circumstances warrant, *see Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1182 (2d Cir. 1996), but in this case plaintiff did not seek such damages.

148 F.3d 149, 166 (2d Cir. 1998); *see also Saulpaugh v. Monroe Cmty. Hosp.,* 4 F.3d 134, 145 (2d Cir. 1993) ("The purpose of back pay is to completely redress the economic injury the plaintiff has suffered as a result of discrimination.") (internal quotation marks omitted).

Because back pay under Title VII is an equitable remedy, it is ordinarily the judge—not the jury—that decides whether back pay should be awarded and, if so, what amount of back pay is appropriate. *See, e.g.*, *Broadnax v. City of New Haven*, 415 F.3d 265, 271 (2d Cir. 2005); *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 157 (2d Cir. 2001). Nevertheless, there are two circumstances where the issue of back pay could reach the jury. First, a court may submit the question to the jury for an advisory verdict. Fed. R. Civ. P. 39(c)(1) ("In an action not triable of right by a jury, the court, on motion or on its own . . . may try any issue with an advisory jury . . . ."); *see also Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 595–96 (2d Cir. 2001). Second, "when a [plaintiff] demands jury consideration of [back pay] under Title VII and the [defendant] fails to object, . . . the district court [may] submit the [back pay] issue for a *non-advisory* jury determination." *Broadnax*, 415 F.3d at 272 (emphasis added); *see also* Fed. R. Civ. P. 39(c)(2) ("In an action not triable of right by a jury, the court, on motion or on its own . . . may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right. . . ."). Under such circumstances, the defendant is deemed to have consented to a jury determination of back pay by virtue of its own silence. *Broadnax*, 415 F.3d at 272.

In this case, plaintiff's complaint requested a jury trial on all issues. *See* Doc. #1-1. In their proposed jury instructions and verdict forms, both parties requested that the jury be instructed regarding back pay and that the jury determine an appropriate amount, if any, of back pay damages. And at the jury trial, both parties presented evidence and questioned witnesses

concerning plaintiff's entitlement to back pay, and the parties presented arguments to the jury during closing arguments about the matter. During the course of trial, however, I raised *sua sponte* the question of whether back pay should be decided by the jury or the Court, and I asked counsel to give thought to the issue. Then, at the charge conference, defendant stated its (new) position that the Court—and not the jury—should ultimately determine back pay, although defendant had no objection to the jury being instructed on back pay and issuing an advisory verdict on the matter.

Following the jury's verdict awarding (among other damages) $31,000 in back pay, I requested that the parties file briefing regarding their positions concerning whether the Court or the jury should decide back pay. In her brief, plaintiff contends that defendant should be deemed to have consented to a non-advisory jury verdict as to back pay damages due to its failure to properly object to the jury instructions. *See* Doc. #69. Defendant argues that it did object to the instructions in a timely manner, and it requests that the Court determine the back pay award (if any), treating the jury's verdict only as advisory guidance. *See* Doc. #70. I find that defendant has the better argument. To make a timely objection to a jury instruction, a party need only "object on the record . . . before the instructions and arguments are delivered." Fed. R. Civ. P. 51(b)(2), (c)(2)(A). Nothing more is required. It is true that defendant changed its position regarding who should determine back pay late in the game—at the final charge conference—and only after I brought the issue to the parties' attention. Nevertheless, defendant did state on the record that the Court should ultimately determine back pay and that the jury's verdict as to back pay should be treated only as advisory guidance, and defendant made these statements prior to the Court's delivery of instructions to the jury. Given this record, I cannot conclude that defendant consented to a non-advisory jury determination as to back pay. Accordingly, the jury's

verdict will be treated as advisory.

While I have the utmost respect for the jury's careful consideration of the evidence and its opinion regarding appropriate damages, I conclude that an award of back pay is not permitted as a matter of law under the present circumstances. As noted above, an award of back pay is based on "what the employee . . . would have earned had he not been *discharged*." *Kirsch*, 148 F.3d at 166 (emphasis added). The Second Circuit has repeatedly held that an inquest as to back pay must focus on the "losses suffered as a result of defendant's discrimination (*i.e.*, from the date of *termination* until the date of judgment)." *Bergerson*, 652 F.3d at 287 (emphasis added) (citing *Saulpaugh*, 4 F.3d at 144–45). Consistent with this case law, I instructed the jury regarding back pay as follows:

> The purpose of damages for lost income or back pay is to redress the economic injury that a plaintiff has suffered from workplace discrimination. An award for back pay may include lost wages as calculated from the date of *employment termination* to the date of judgment in this case, minus the amount of earnings and benefits that [plaintiff] received from other sources during that time.

Doc. #59 at 12 (emphasis added).

In view of this well-established legal framework, it is difficult to understand how a judge or a jury could even calculate back pay damages in the absence of a discharge, termination, or other adverse employment action that resulted in pecuniary loss. Of course, a hostile work environment claim does not require the existence of any tangible adverse employment action; all that is required is the existence of a discriminatory and abusive work environment. *See, e.g.*, *Forklift Sys., Inc.*, 510 U.S. at 21 (noting that Title VII prohibits a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult" even where there is no "economic or tangible discrimination") (internal quotation marks omitted). A hostile work environment plaintiff may, however, assert a constructive discharge claim if the discriminatory "working conditions [were] so intolerable that a reasonable person would have felt compelled to resign,"

and it is clear that "a constructive discharge is functionally the same as an actual termination" as far as damages are concerned. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147, 148 (2004).

In this case, there is no dispute that plaintiff was not actually discharged, nor was she subject to any other tangible adverse employment action. Plaintiff did bring a constructive discharge claim, but the jury found in favor of defendant on that claim. Moreover, there was evidence at trial that plaintiff had plans in the works to leave her job at the diner to pursue her education (and as she did).

Under these circumstances—where a prevailing plaintiff in a meritorious hostile work environment case was subject to neither an actual discharge nor a constructive discharge—an overwhelming majority of courts of appeals have ruled that back pay damages are not available. *See, e.g.*, *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1095 n.12 (10th Cir. 2007) (holding that, in hostile work environment cases, "'the equitable remedy of backpay is only available . . . when the plaintiff has demonstrated that she was constructively discharged'") (alteration in original) (quoting *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1237 (10th Cir. 2000)); *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 659 (7th Cir. 2001) ("A victim of discrimination that leaves his or her employment as a result of the discrimination must show either an actual or constructive discharge in order to receive the equitable remedy of . . . back . . . pay . . . ."); *Caviness v. Nucor-Yamato Steel Co.*, 105 F.3d 1216, 1219 (8th Cir. 1997) ("Because [plaintiff] proved no concrete effect on [her] employment status as the result of the [hostile work environment] she suffered, she is not entitled to backpay.") (internal quotation marks omitted); *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 755 (3rd Cir. 1997) ("Courts of appeals have been nearly unanimous in their application of the constructive discharge rule, whereby victorious Title

VII plaintiffs who have left their employment with the defendant but who were not constructively discharged by the defendant are only entitled to a remedy covering the period during which the discrimination occurred up to the resignation.") (internal quotation marks omitted); *but see Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 651–52 (4th Cir. 2002) (back pay available to Title VII plaintiff who voluntarily leaves employment after gender-based discrimination because plaintiff mitigated her damages); *see also Brown v. D.C.*, 768 F. Supp. 2d 94, 100–02 (D.D.C. 2011) (discussing precedents).

This rule is also cited as black letter law in numerous secondary sources. *See, e.g.*, 2 Emp. Discrim. Coord. Analysis of Federal Law § 62:16 ("[A] successful hostile work environment claim alone, without a successful constructive discharge claim, is insufficient to support a back pay award, because if a hostile work environment does not rise to the level where one is forced to abandon the job, loss of pay is not an issue."); 2 Fair Employment Practices § 15:22 ("If a hostile work environment does not rise to the level where the employee is forced to abandon the job, loss of pay is not an issue."); 2 Disability Discrimination Workplace § 25:2 ("A successful hostile work environment claim alone, without a successful constructive discharge claim, is insufficient to support a backpay award.").

Although research does not disclose that the Second Circuit has resolved this issue, I choose to follow the clear majority rule.[8] If a plaintiff has not established that she was constructively discharged, it makes little sense to award back pay as a form of damages.

## CONCLUSION

For the reasons stated above, defendant's motion for judgment as a matter of law (Docs. #64, 71) is DENIED. The jury's verdict as to back pay is treated as advisory guidance only, and

---

[8] If the parties believe that the Second Circuit has ruled on this issue or that there is other authority that would warrant reconsideration of this aspect of the Court's ruling, they are invited to file a timely motion for

the Court DENIES any award of back pay. The Clerk of Court is directed to enter judgment forthwith in plaintiff's favor in the amount of $53,501—the total of the jury's $22,500 emotional distress damages award and $31,001 punitive damages award. In view of the entry of judgment, plaintiff's motion for a prejudgment remedy (Doc. #68) is DENIED as moot.

The Clerk of Court is directed to close this case.

It is so ordered.

Dated at Bridgeport this 10th day of March 2015.

                                          /s/ *Jeffrey Alker Meyer*
                                          Jeffrey Alker Meyer
                                          United States District Judge

---

reconsideration.